## WEAKLEY v. PAGE.

### (*Nashville.*     March  16,  1899.)

1. NUISANCE.  *Jurisdiction to enjoin.*

   A Court of Equity has jurisdiction to enjoin the owner of property from keeping or permitting a house of ill fame to be kept therein, at the suit of owners of adjacent or contiguous properties adapted and used for business and residence purposes, where, by reason of the boisterous and vulgar conversation and the public, immoral, and indecent conduct and exposure of person of the inmates of the house and their visitors, it has become a nuisance to the entire neighborhood, and has seriously affected and impaired the value and rental productiveness of the complainant's property.   (*Post, pp. 191–206.*)

   Cases cited and approved: Brew v. Van Deman, 6 Heis., 433; Lassiter v. Garrett, 4 Bax., 368; 11 Md., 128.

2. SAME.   *Same.*

   The jurisdiction of Courts of Equity to enjoin and abate nuisances is not affected by the statute giving the power to Courts of Law to abate a nuisance where the fact of nuisance is found in a civil action.   (*Post. p. 192.*)

3. SAME.   *Same.*

   A Court of Equity will enjoin and abate a nuisance, without a judgment at law establishing its existence, where the fact of nuisance is made manifest by certain and reliable proof, and the resulting injury is of a character that cannot be compensated adequately by damages.   (*Post, pp. 192, 193.*)

   Cases cited and approved: Vaughn v. Law, 1 Hum., 134; Clack v. White, 2 Swan, 540; Phillips v. Stocket, 1 Tenn., 200; Wall v. Cloud, 3 Hum., 182; Kirkman v. Handy, 11 Hum., 407; Naff v. Martin, 2 Shan., 451; Caldwell v. Knott, 10 Yer., 210.

4. SAME. *Same.*

That a nuisance is the subject of criminal prosecution does not deprive the Court of the power to enjoin and abate it at the suit of a citizen who has suffered special injury from it. (*Post, pp. 195, 196.*)

Cases cited: 27 N. H., 503; 63 N. H., 12; 28 Kan., 726; 65 Iowa, 488; 149 Mass., 550 (S. C., 5 L. R. A., 193); 1 Dev. Eq., 12; 10 Ill., 351; 26 Iowa, 377; 87 Ill., 450.

5. SAME. *Same.*

The Court will not enjoin and abate a public nuisance unless the complainant avers and proves some injury special and peculiar to himself which is not shared by the general public. (*Post, p. 194.*)

Cases cited: 14 Conn., 565; 2 C. E. Green, 75; 3 Neb., 179; 2 Beas., 68.

6. SAME. *Same.*

If otherwise entitled to an injunction against a nuisance, the complainant will not be repelled because he does not himself occupy the property involved. (*Post, pp. 203, 204.*)

7. SAME. *Same.*

Both residence and business properties will be protected by injunction against nuisances specially affecting their values, but relief will be granted more readily in favor of residence than of business properties. (*Post, pp. 204–206.*)

---

FROM DAVIDSON.

---

Appeal from Chancery Court of Davidson County. H. H. COOK, Ch.

LELLYETT & BARR for Weakley.

N. D. MALONE and M. W. ALLEN for Page.

CALDWELL, J. This cause comes to this Court on the appeal of the defendants from the decree of the Court of Chancery Appeals. The controlling questions presented in the assignment of errors and argument before us are the same as those considered by that Court in an elaborate and able opinion delivered by Judge Neil. We refer to that opinion for a statement and discussion of those questions. It is as follows: "This bill was originally filed by R. L. Weakley and Mrs. Sarah C. Paige. As to the latter, the suit was dismissed below on her own motion, and subsequently proceeded in the name of Mr. Weakley alone. We shall, therefore, set forth such allegations as were made by Mr. Weakley, ignoring those especially referring to Mrs. Paige. The purpose of the bill is to abate, as a nuisance, a house of ill fame, existing in close proximity to complainant's property, on the ground of special injury to the complainant. The bill alleges that W. W. Page owned and controlled a block of buildings on the corner of Line and College Streets in the city of Nashville; that the first floor is divided into three store rooms; that the second story is divided into rooms and halls, and is suitable for residence purposes.

"It is further alleged that complainant Weakley owns a block adjoining the property of Page, on College Street, immediately north of said Page building, and running back west with that building about 174 feet; that said Weakley's building fronts on

College street and contains two stories, the first consisting of three business houses or store rooms and the second cut into halls, corridors, rooms, etc., with the necessary stairways for ingress and egress, suitable and intended for residence purposes; that complainant, Weakley, also owns a block of three two-story buildings on the east side of College Street, and fronting the said W. W. Page property; that this property also contains three store rooms on the first floor and residence rooms in the second story.

"It is further alleged that the rental value of complainant, R. L. Weakley's, said block of two-story brick buildings is about $110 per month. It is further alleged that the defendant, W. W. Page, a short time before the filing of the bill, had put the defendant, Mattie Vaughn, in possession of the second story of his block of buildings, and that she and those residing with her had occupied this property for one or more months prior to the filing of the bill; that Mattie Vaughn was and is an abandoned and disreputable woman, and her character as such was well known to the defendant, Page; that the defendant, Mattie Vaughn, has had and still has with her, in said second story of said building, ten or twelve abandoned women, and is there conducting a bagnio, which is publicly and notoriously frequented day and night by numbers of men and boys for immoral purposes; that the defendant, Mattie Vaughn, and the women with her are engaged in the illegal sale of intoxicating liquors on the prem-

ises, and that drunkenness is added to their other disturbing practices; that this conduct and these practices are open, public, and notorious, and the reputation of the place is widely known, and that residents in the locality and passers-by are offended and disturbed, and the rental and money value of complainant's property in that locality is greatly reduced thereby; that many of the houses in the immediate neighborhood, and especially the three two-story brick buildings on the west side of College Street, complainant's buildings, were, at the time the bill was filed, vacant, and that respectable tenants could not be procured on account of the proximity of the bagnio; that complainant is being greatly damaged by the loss of rents and depreciation in the value of his property on account of this nuisance, and is subjected to further loss, and can only be protected against irreparable injury by the injunctive aid of the Court.

" It is further charged that it is unlawful to let premises for such purposes; that keeping a house of ill fame is a nuisance under the laws of this State; that defendant, Page, is well apprised of the uses being made of said premises, and knew that they would be so used before he made the arrangement with his co-defendant, and connived, and continues to connive, at the same.

" It is further charged that ' the public and community are shocked and offended at the existence of said resort, and said premises and their uses are

both a private and public nuisance.' There is also an allegation that the sounds and sights attendant upon the occupation of the Page premises by defendant, Vaughn, and the women with her, are offensive, disturbing, and humiliating.

"The substance of the bill as to the nuisance is, that the defendant, Mattie Vaughn, with the connivance of Page, the owner of the premises, is conducting a house of ill fame with several lewd and abandoned women under her charge; that the house is publicly and notoriously frequented, by day and by night, by numbers of men and boys for indulgence in lewd and immoral practices; that added to these practices in the place referred to, is that of drunkenness, fostered by the illegal sale of liquor on the premises; that the place is widely known; that the conduct and practices of the house are open, public, and notorious; that there are attendant sights and sounds which are disturbing, offensive, and humiliating to the residents in the neighborhood and to passers-by; that, as a consequence, complainant's property adjoining and near by has been very greatly damaged in its rental and money value, and is being very greatly damaged thereby, and that complainant is being subjected to further loss, and can only be protected from irreparable injury by the injunctive aid of the Court; that by reason of such nuisance he has lost valuable tenants and his houses are empty, and that respectable tenants can-

not be procured for complainant's buildings on account of the bagnio.

"The facts as stated in the bill are substantially true with a few exceptions, which will now be stated. These exceptions are, that at the time the bill was filed, while complainant's houses on the west side of College Street were vacant those on the east side were occupied, but at a greatly reduced rent; and, further, it should be stated that pending the suit most of complainant's houses (all but one) on the west side of College Street were occupied by tenants, but at greatly reduced rents. These tenants went in some time after the suit was begun. Another exception that must be made is, that while defendant, Vaughn, did not occupy the front of the Page building until about one month before the bill was filed, she, or some other woman similarly employed, had occupied the back portion of that building for some years.

"The facts with regard to the nuisance appear in the proof with more detail than is stated above, and it is proper to refer to this testimony, which we shall now do.

"The witness, Klymon, says that the women leave the blinds on the front windows open, and can be seen from the outside naked in their rooms with men, and that conduct of this kind continues from about 3 or 4 o'clock in the afternoons until far into the night; that men come and go in crowds; that sometimes there are as many as ten or twelve

hacks there. Continuing, he says: 'There is a good deal of noise, big noise, cursing and obscene language. The whole Page block upstairs is now occupied by them. They disturb the neighborhood so that respectable people cannot sleep and rest in the neighborhood, and the families and children are disturbed by them.' He further says that about two or three weeks before his deposition was taken, 'women, about 2 or 3 o'clock in the morning, threw a great many beer bottles, making a noise, cursing and calling vulgar names that could be heard blocks away. It attracted crowds of people, and caused much disturbance to the neighbors.'

"J. R. Whiteley, a policeman, says: 'We went to this house twice about the first or middle of 1896 for the purpose of quieting boisterous conduct;' that when he got there he found men and women dancing and singing, also they were drinking and talking loud and hallooing, and he threatened to arrest the 'whole crowd' if they did not stop.

"S. Rosenfield says: 'They cut up, laughing, singing, and hallooing, making vulgar music, cursing; have seen them through the windows, partly undressed, and crowds of men going there day and night.'

"Mrs. Jennie Murray says: 'I have seen the women who occupy this building sitting on the porch which runs along the north side of the Page building exposing their persons, smoking cigars, playing cards with men, laughing and shouting, and using

vulgar and obscene language, calling to all men they see, attracting passing men, and generally conducting themselves indecently.'

"F. M. Shuster says; 'They are very noisy at night. I have frequently heard them scream, and have gotten up at night to learn what the matter was. I have heard loud sounds, sometimes like the slapping of bare skin, with loud laughing, etc., and have seen them pass the window naked in view of the street; have seen a great many men going in and out there. Those disturbances sometimes occurred as late as 2 o'clock in the morning.'

"Mrs. Clara Loubelsky says : 'They can be seen in the hallways in slight garments, smoking cigars, and cursing, pulling and hauling men, trying to get men in. I have seen them naked in the same room with men. I have seen men embrace them when in this condition. Men come to the place at all times at night, driving up in hacks, singing and using vulgar language, which is heard and repeated and used back at them by the women. I have seen the porter going into the building with drinks and lunches. I have seen drunken men go up there often.' She further says: 'I am disturbed all night. You would think the whole building would come down.'

"Mrs. F. Levy, who lives in Mr. Weakley's building that adjoins the Page property, with her family of four boys, aged respectively five, ten, thirteen, and sixteen, and two girls, aged eighteen

and eleven respectively, says of the women in the Page building: 'They are up all night singing, drinking, cursing, fighting, throwing bottles, going undressed, acting indecently with men, and generally debauching the neighborhood, making the whole neighborhood bad.' This witness testifies that she first lived in complainant's building in the year 1894, beginning on the eighteenth of September, and remaining four months, but moved away because of the inmates of the Page building—in the back part of it upstairs; that she then lived in the upstairs portion of complainant's building, but since she returned occupies a room in the front part and downstairs; that when she returned none of these aban doned women were in the front part of the Page building, but moved in a month or two afterwards.

"The weight of the proof is that the presence of this house, with conduct such as we have detailed, very materially injures the rental value of property in the neighborhood, though there is testimony to the effect that these poor creatures pay higher rent than anybody else, and that their proximity furnishes trade to the small dealers who occupy that locality. However, the testimony of the best informed shows that it inflicts serious injury upon the value of adjoining property and property near by. As to Mr. Weakley's property, while it is now partially occupied (one room downstairs by Mrs. Levy as a grocery store, and three rooms upstairs by Mrs. Cohen for residence purposes, and

also one room downstairs by her as a grocery store, only one store being still vacant), yet the complainant has suffered seriously in the value of his property in the way of depreciation of rents. He says in his deposition: 'A great many people have refused to rent from me because my property adjoins Page's property. I take people down there to see the property, and as soon as they see how the upper part of this (Page) property is occupied, they won't rent. I took a gentleman down there on one occasion to inspect my houses, he desiring to rent one of them, and after going through he observed some women in scant clothing, undressed, in these apartments, and he immediately declined to rent on the ground that he could not live near such people. This same thing has happened on other occasions, all of which I cannot recall. Q. Has this fact affected the rental of your property? A. Put it down to nothing. When this property, where the women now are (Page's property), was occupied by the Louisville & Nashville Railroad Company's office, several years ago, I got $900 a year for the large brick on the west side. Now, since these women have come in there, I get $16 per month for the big brick and $12 per month for the other two houses, one of which is not rented. Q. What about the property on the other side of the street? A. It has been affected some, too. I got $900 for the corner of Locust and College and $25 a month for the middle house, and $25 for the

house just adjoining Link's. I now, and since the railroad moved out and this occupation began, only get $600 a year for the corner, and less for the other two buildings.'

"Some effort is made to show that Mr. Weakley himself rented his buildings to disreputable characters. It is proven that some five years before the bill was filed, when this property was owned by a brother of the complainant, since deceased, such characters were allowed in these buildings or some of them. Since the complainant has owned the property he has steadily refused to rent to such people. It is true, that soon after this suit was begun, a Madame Breeson, a dissolute French woman, rented one of the two rooms, under pretext of opening a cigar stand, but really used it for immoral purposes. As soon as the complainant discovered it he had her ejected from the building by legal process. It is also true that, for a time, one Tom Payne, who seems, from the proof, to have a very bad reputation, ran a saloon in complainant's property on the opposite side of the street—that is, on the east side of College Street—but complainant also refused to rent to him when he discovered the character of the house. The proof fails to attach any blame to the complainant in the particulars referred to.

"It is also insisted by the defendant, an important point, that the whole neighborhood is bad, and that for that reason complainant's property could not be injured by the character of the occupants in the

upper story of the Page building. The proof shows pretty clearly that Locust Street, which runs into College nearly opposite the Page building, is occupied principally by people of disreputable character, also that Gay Street, the next street to Line, is occupied by people of the same reputation, and also the alley leading from Gay to Line. But the proof fails to show such a character for College Street from Line to the railroad. Northward the character of the street is very bad. As to Line Street, from College to Cherry, the proof is conflicting to such an extent that we are unable to determine how the fact is beyond the Page house, except that there are two houses of this character on the street besides the Page house. Take it altogether, the neighborhood is unsavory. This, however, does not apply to College Street from Line to the railroad crossing. It should be noted that the rear part of the Page building, fronting north, overlooks the rear yard of the Weakley property, used by families living over the Weakley stores, and that running along this Page building on that side is a porch upstairs, and numerous windows opening on to the porch. It should also be noted that on the southern and eastern side of the Page building upstairs there are numerous windows opening on the street.

"In regard to the statement in the bill that Mr. Page was aware of the character of the use to which his building was put, we think it proper to say that we base our finding that the charge is

true on the ground that he must be presumed to know the use to which his building is put, and also on the proof, which shows that he gave his personal check for $1,028 to a furniture establishment in the city to fit up this house, as shown by the testimony of C. G. Finney, and further, on the fact that he has not deposed as a witness in this case to deny the grave charges made in the bill or the testimony of Mr. Finney.

"We shall now consider the legal rules that govern the controversy.

"1. The jurisdiction of a Court of Equity to abate nuisances is clear in Tennessee. In *Brew* v. *Van Deman*, 6 Heis., 433, 440, it is said that a Court of Equity has jurisdiction, upon the ground of its ability to give a more complete and perfect remedy than is attainable at law, to prevent by injunction such nuisances as are threatened, as well as to abate those already existing. 'The grounds of jurisdiction,' says the Court, 'are the restraining of irreparable mischief, suppressing oppressive and interminable litigation, or preventing multiplicity of suits, or where the mischief, from its continuance or permanent character, must occasion a constantly recurring grievance, which cannot be prevented otherwise than by injunction.' In the case of *Lassiter* v. *Garrett*, 4 Bax., 368, 370, after quoting the above language, the Court says (in that case the question under consideration was whether a milldam was a nuisance): 'It is clear that if the dam in question

has permanently destroyed the health of the complainants, or persons occupying their premises, this would be a constantly recurring grievance and injury, not to be compensated in damages, and a proper case for a Court of Chancery to interpose and compel an abatement of the nuisance, and we are of the opinion that the Act of 1851–52 (Code, § 3403), which authorizes Courts of law to abate nuisances, where the fact of nuisance is found in a civil action, does not take away the jurisdiction of a Court of Chancery. The question is, in what cases and under what circumstances is the jurisdiction exercised? Judge Story laid down the rule that, in all cases of this sort, if the right be doubtful, the Court will direct it to be tried at law, and will, in the meantime, restrain all injurious proceedings, and when the right is fully established a perpetual injunction will be decreed.' In *Vaughn* v. *Law*, 1 Hum., 134, it is said: 'In a case where the right is clear, and the existence of the nuisance manifest, and the injury is of a character that cannot be compensated in damages, a Court of Chancery interposes to prevent the mischief. In such a case a trial at law is not necessary in order to give the Court jurisdiction.' In *Clack* v. *White*, 2 Swan, 540, 544, 545, the Court says: 'The rule is well and truly stated in *Vaughn* v. *Law*. If the fact of nuisance manifestly appears from certain and reliable proof, we see no reason why it should be first established in a Court of Law, if that be the

only objection.' To the same effect see *Phillips* v. *Stocket*, 1 Tenn., 200; *Wall* v. *Cloud*, 3 Hum., 182; *Kirkman* v. *Handy*, 11 Hum., 407; *Naff* v. *Martin*, 2 Shann. Tenn. Cases, 451; *Caldwell* v. *Knott*, 10 Yer., 210.

"2. The facts stated make out a case of nuisance clearly. It is declared in the Code: 'Houses of ill fame kept for the purpose of prostitution and lewdness, gambling houses, or houses where drunkenness, quarreling, or fighting or breaches of the peace are carried on, or permitted, to the disturbance of others, are nuisances also.' Shannon's Code, § 6870. So, under the general law, the keeping of a house of ill fame is such a nuisance as may be relieved against in equity, at the suit of adjacent property owners who are injured thereby. The following citations of authority are in point: High on Injunctions (2d Ed., Vol. 2, Secs. 772, 773, 779, 780, 782). In the last section it is said: 'The general principles of equity with regard to nuisances and their restraint, apply to houses of ill fame, and the continuance of such houses may be restrained upon a bill filed by private persons, alleging that the close proximity of such nuisance to their private residence deprives them of the comfortable enjoyment of their property, and greatly diminishes its value.' The section just quoted refers for authority to *Hamilton* v. *Whitridge*, 11 Md., 128. Counsel for complainant also refer to the case of *Anderson* v. *Doty*, 33 Hun, 160, and *Crawford* v. *Tyrell*, 128 N. Y.,

18 P—13

341, as sustaining the same view. We shall have occasion to refer to these cases later on.

"3. Of course, a house of ill fame is a public nuisance. This being true, it is insisted by the defendants that no private citizen can bring a bill to restrain such a nuisance, or any other public nuisance, unless the complainant can show some injury of a serious nature to himself different and apart from the general injury to the public, and, to support this proposition, the defendants cite the following authorities, which sustain the point: *Bigelow* v. *Hartford Bridge Co.*, 14 Conn., 565; *Hinchman* v. *Patterson H. R. Co.*, 2 C. E. Green, 75; *Shed* v. *Hawthorn*, 3 Neb., 179; *Allen* v. *Beard*, 2 Beas., 68; also High on Injunctions, 762, 769.

"4. It remains to be settled whether the facts stated make such a case of special and peculiar injury to the complainant as will entitle him to maintain the bill. In the case of *Hamilton* v. *Whitridge*, *supra*, an injunction was granted upon a bill stating that the appellees were owners of property in the city of Baltimore, in the immediate vicinity of a house which the appellant had purchased, and to which she intended to move, for the purpose of keeping a house of ill fame, in which business she had been for a long time, and was then engaged. The bill charged, also, that in addition to the wrong and injury inflicted upon them, in common with other citizens of that city, by the occupants of the premises, for the unlawful and immoral purposes com-

plained of, 'the complainants will be especially wronged and injured, inasmuch as they will be deprived of the comfortable enjoyment of their property, and that it will be greatly depreciated and lessened in value, by the close proximity of their said property to the premises in which it is charged that the defendant is about to open a bawdy house.' The Court found that it was true that the appellant was about to open such a house on the property in question, and said: 'We are constrained, therefore, to consider the appellant as a person about to open the premises as a house of ill fame, and the prominent question for decision is whether the jurisdiction of Courts of Equity embraces a prohibition of such public nuisances, where the complaint is that they will, by reason of their close proximity, deprive other persons of the comfortable enjoyment of their property and greatly depreciate and lessen its value.' The question was decided in the affirmative. After referring to the general principle that the complainant must show some special injury to himself, and to cases where the physical senses were offended, as, for instance, where the ringing of church bells was enjoined, when the noise thereby created disturbed the plaintiff and his family, the Court said: 'But the appellant's counsel suggested that a distinction should be taken between the cases relied on in support of their position and the present, because here the object is to prevent what is offensive to the moral sense. We need not inquire

how far this jurisdiction can be founded on grounds
of morality, and to preserve the decencies of life
from gross violation. The case does not re-
quire this. But it would be strange, indeed, if,
when the Court's powers are invoked for the pro-
tection and enjoyment of property, and may be
rightfully exercised for that purpose, its arm should
be paralyzed by the mere circumstance that, in the
exercise of this jurisdiction, it might incidentally per-
form the functions of a moral censor, by suppress-
ing a shocking vice denounced by the law, and
amenable to its penalties from the earliest times.
And if, as the authorities show, the Court may in-
terfere where the physical senses are offended, the
comfort of life destroyed, or health impaired, these
alone being the basis of the jurisdiction, the present
complainants, presenting, as they do, a case other-
wise entitling them to the relief, should not be dis-
appointed merely because the effect of the process
will be to protect their families from the moral
taint of such an establishment as the appellant pro-
poses to open in their immediate vicinity.' This
case was decided in 1857, and, as will be observed,
the establishment of a nuisance was restrained be-
cause it threatened injury to adjacent property
owners. In the case of *Anderson* v. *Doty*, decided
by the Supreme Court of New York in 1884 (33
Hun, 160), it was said that *Hamilton* v. *Whitridge*
might possibly be sustained as an exercise of the
power of a Court of Equity to prevent the erection

of a nuisance, but not to abate a nuisance, which could only be abated by a judgment of the Criminal Court. In *Anderson* v. *Doty* the nuisance was said to consist merely in the fact that the defendant's house was a house of ill fame, kept as a dwelling. place for prostitutes, and a resort for lewd men and women, for lewd purposes, and as a bawdy house. The Court said there was no allegation of any noise or of any physical discomfort or tangible injury to the persons of the occupants of plaintiff's house, or to the property, but the injury complained of was entirely consequential in its nature, arising from the fact that decent people will avoid such places, however quietly conducted, because of the consequences they apprehend may occur, although such apprehension may never be realized. The defendant's counsel based his motion to vacate the injunction upon the grounds that a private action would not lie to restrain a public nuisance, unless the plaintiff should suffer an injury by it to his person or property different in character from that common to all citizens, and, further, that the particular injury must be some physical discomfort or physical injury to the property. The Court sustained this view of the matter, saying: 'In this case there are alleged no offensive sights or sounds from defendant's house, but the injury is caused because the existence of the nuisance gives the neighborhood a bad name. I do not think this is a sufficient injury to plaintiff to enable him to main-

tain this action.' The Court also said that it was
of opinion that Courts of Equity were not proper
tribunals to deal with the matter, but that it should
be left to the Criminal Courts. There was a strong
dissenting opinion by one of the judges. In the
later case of *Crawford* v. *Tyrell*, 128 N. Y., 341,
decided by the Court of Appeals of that State in
1891, a different view was taken so far as the las
point mentioned in *Anderson* v. *Doty*, is concerned,
and the proposition established that an injunction
will lie to restrain a defendant from keeping a house
of ill fame and from using his premises for such
a purpose, where the persons occupying such prem-
ises act in a noisy and boisterous manner and make
indecent exposures of their persons. In that case
the action was brought to prevent the defendant
from keeping a house of ill fame, and from using
the premises for such purpose, and to recover dam-
ages for injuries sustained. The trial Court found
the facts to be that the house, as maintained by
defendant, was a resort for prostitutes and licentious
men, and that the persons occupying the rooms acted
in a boisterous and noisy manner, and indecently
exposed their persons at the windows, 'whereby the
use and occupation of the plaintiff's premises have
been interfered with and rendered uncomfortable, and
whereby the occupants of plaintiff's premises have
been annoyed and seriously disturbed.' The Court
held that this made out a sufficient case for
interference by injunction at the suit of a

property owner. In discussing the question, the
Court said that the mere fact of a business
being carried on which may be shown to be
immoral, and, therefore, prejudicial to the character
of the neighborhood, furnishes, of itself, no ground
for equitable interference at the suit of a private
person; and though the use of the property might
be unlawful or unreasonable, unless special damage
should be claimed, a neighboring property owner
could not base thereupon any private right of action;
that it would be for the public authorities, acting
in the common interest, to interfere for the sup-
pression of the common nuisance; but that if com-
plainant in such private action could show a special
damage, by which the legitimate use of the adjoin-
ing property was interfered with, or its occupation
rendered unfit or uncomfortable, the action would lie,
and the fact that the perpetrator of the nuisance
would be amenable to the criminal law would be no
answer to an action against him by a private person
to recover for the injury sustained, and for an in-
junction against the continued use of his property
or premises in such a manner. In closing the
opinion the Court said: 'In the present case the
indecent conduct of the occupants of the defendant's
house, and the noise therefrom, inasmuch as they
rendered the plaintiff's house unfit for comfortable or
respectable occupation, and unfit for the purpose it
was intended for, were facts which constituted a
nuisance and were sufficient grounds for the main-

tenance of the action. If it was a nuisance which affected the general neighborhood, and was the subject of an indictment for its, unlawful and immoral features, the plaintiffs were none the less entitled to their action for any injuries sustained, and to their equitable right to have its continuance restrained.' This opinion being later than *Anderson* v. *Doty*, and by a Court of higher authority, and supported by stronger reasons, discredits that case in so far as it was based on the ground that a Court of Equity could not properly dispose of such a matter because the nuisance might be made the subject of an indictment in a Criminal Court. In fact, the authorities are overwhelmingly against *Anderson* v. *Doty* on this point. 'In regard to public nuisances,' says Judge Story, ' the jurisdiction of Courts of Equity seems to be of a very ancient date, and has been distinctly traced back to the reign of Queen Elizabeth. . . . In case of public nuisances . . . an indictment lies to abate them and to punish the offender. But an information also lies in equity to redress the grievance by way of injunction.' Eq. Jur., Secs. 921, 923.

"And again: 'In modern times Courts of Law frequently interfered and granted a remedy under circumstances in which it certainly would have been denied in earlier periods. And sometimes the Legislature, by express enactments, has conferred on Courts of Law the same remedial faculty which belongs to Courts of Equity. In neither case, if the Courts of

Equity originally obtained and exercised jurisdiction, is that jurisdiction overturned or impaired by this change of the authority at law by legislative enactments, for, unless there are prohibitory or restrictive words used, the uniform interpretation is that they confer concurrent and not exclusive remedial authority.' Story Eq. Jur., Secs. 64, 80. So, where the wrongful flowage of a meadow by a mill pond is made a criminal offense, punishable, on indictment, by fine and imprisonment, this does not take away the specific relief by a bill in equity by injunction. *Wells* v. *Pearce*, 27 N. H., 503, 512, 513; *Allen* v. *Gibson*, 63 N. H., 12. So, in *State* v. *Crawford*, 28 Kan., 726, and 42 Am. Rep., 182 (an action to abate a liquor saloon, declared by a statute to be a common nuisance), the Court said (pages 735, 736): 'While it is unquestionably true that the keeping of the saloon in question is a criminal offense, and its operation involves the commission of many criminal offenses, yet we cannot think that these facts can possibly take away any of the jurisdiction which Courts of Equity might otherwise exercise. It would seem to us that all sound reason and the great weight of authority is against the objection . . At common law all public nuisances were public offenses, and, if the proposition is sound that no nuisance can be enjoined except such as are not public offenses, then, where the common law has full force, no public nuisance could ever be enjoined.' In the case of *Littleton* v. *Fritz*, 65 Iowa, 488 (54 Am.

Rep., 19), the Supreme Court of that State used the following language on the general subject: 'One maintaining a nuisance may not only be punished in a criminal proceeding, but a civil action at law to recover damages in a proper case, and an action in equity to restrain the nuisance may be prosecuted against him. The defendant, in order to succeed in the defense that the proceeding by injunction is an attempt to enforce a criminal law by civil process, demands, in effect, that the Court must establish the principle that, because the nuisance complained of is a crime, it is entitled to favor and protection in a Court of Equity. There are many adjudged cases which expressly hold that the fact that a nuisance is a crime, and punishable as such, does not deprive equity of its jurisdiction to restrain and abate it by injunction. See, also, *Carleton* v. *Rugg*, 149 Mass., 550 (5 L. R. A., 193); *Attorney-general* v. *Hunter*, 1 Dev. Eq., 12; *People* v. *St. Louis*, 10 Ill., 351, 367; *Ewell* v. *Greenwood*, 26 Iowa, 377; *Minke* v. *Hopeman*, 87 Ill., 450, 453, 454. Of course, as already stated, before a private person can proceed, he must show some special injury to his person or property, and, further, it is true, that where the proceeding in equity is based merely on the ground that the nuisance is a public one, the proper proceeding is by information by the Attorney-general. *New Aqueduct Board* v. *Passaic*, 45 N. J. Eq., 393; *Georgetown* v. *Alexandria Canal Co.*, 12 Peters, 91, 98. As to the limits of this latter power we are

not now concerned; but cite the last two cases merely upon the point that equity is not deprived of its jurisdiction to abate nuisances, either public or private, by the fact that the perpetrators of such nuisance are also amenable to the Criminal Court.

"Applying the above principles to the case in hand, we are of the opinion that the Chancery Court had jurisdiction to abate this nuisance, and should have done so. That it is a nuisance by statute (Shannon's Code, § 6870) and at Common Law (Bacon's Ab., title Nuisance, A) is undoubted; that the inmates of this house were very noisy and boisterous, and were constantly guilty of the exposure of their persons at the windows of the house and outside porches, within view of the adjoining houses, including that of the complainant, is established by the facts above found; that complainant has also suffered injury special to himself in the great deterioration of his rents on account of this nuisance, and that his buildings, fitted up not only for business houses, but also for the occupation of families in the upper stories of them, have also been very greatly impaired for comfortable enjoyment and occupation by decent people, and that the complainant is thereby especially and particularly injured in the use of his property by the existence and maintenance of this nuisance, is also shown by the facts found. It is urged in behalf of the defendants that the complainant does not himself live in either one of his houses on College Street, but in a distant

part of the city. This is true, but immaterial. The complainant had not only the right to use the the lower floor of his buildings for stores, but an equal right to use the upper floors or stories as dwellings for those who might occupy the store-rooms, or for others. The defendants, by maintaining this nuisance, had no right to impair the complainant's use of his property for either of these lawful purposes.

" We think there is no force whatever in the point that the complainant himself must dwell in the adjacent property. There seems to us to be no reason in the distinction. If he has the right to protect his own dwelling, he has also the . right to protect that of his tenants, and hence his property intended for tenants. If this were not true, while the tenants could always protect themselves by moving away, the landlord would be compelled to see his property go to ruin, while the Court of Equity would be powerless to help him. We have already shown that, with regard to both public and private nuisances, where an individual is affected seriously thereby, the jurisdiction of the Court of Equity is ample to afford him relief by injunction. To recur, then, to the thought we were considering a moment ago, we say there is no sound distinction, in applying the relief which equity affords, to say that it will be given for the protection of a man's individual dwelling, but not for a house which he intends as a dwelling for his tenants and

which is devoted to that purpose. Nor indeed do we think that the relief should be confined merely to dwellings. While it may be true, as stated in Section 769 of High ´ on Injunctions, that 'an injunction will be denied against the perpetration [of a nuisance] prohibited by public statute, the only ground urged for the relief being diminution of the profits of a trade or business pursued by complainant in common with others,' it is not true that equity would deny relief to one who is deprived of the comfortable enjoyment of his property, and which property is greatly diminished in value by reason of a nuisance maintained on neighboring property, even though the property injured is used only for business purposes. Of course a Court of Equity would find an injury to exist and grant relief under much slighter circumstances in favor of a dwelling than in favor of a business house. The distinction is dictated by the different uses to which the property is put. We think, however, such noise and such indecent exhibitions as this proof shows would be intolerable even to the owners and occupiers of business houses, special injury being the true ground of relief, and that being shown in this case as to both stores and dwelling rooms.

"On the grounds stated, we are of opinion that the Chancellor was in error in dismissing the bill. A decree should have been entered by the Chancellor ordering the nuisance to be abated, and the injunction against its maintenance should be made perpetual.

The cause will be remanded to the Chancery Court, to the end that the proper decrees may be entered abating the nuisance and making the injunction perpetual.

"The defendants will pay the costs of this Court and of the Court below accrued up to the present time. Further costs in the Court below will be paid as may be decreed by the Chancellor.

"All the Judges concur.

"M. M. NEIL, *Judge.*"

Upon the grounds and for the reasons so well stated by the Court of Chancery Appeals, we approve its conclusion and adopt its opinion as our own. Let the decree be affirmed.