344 So.2d 500 (1977)
Jack DANIELS et al.
v.
Ralph A. CHAPUIS and Helen M. Chapuis.
SC 2030.
Supreme Court of Alabama.
April 8, 1977.
*501 Sanford D. Weiss, of Weiss & Sawyer, Montgomery, for appellants.
J. Donald Reynolds, Montgomery, for appellees.
JONES, Justice.
This appeal by Jack Daniels, Charles Todd, and Drag Racing, Unlimited, Inc. (Dragstrip), from a decree granting injunctive relief to adjoining property owners, Ralph A. and Helen M. Chapuis, challenges the power of the court to regulate a business which admittedly creates a nuisance but is otherwise lawful. The basic issue is whether the trial Court erred in enjoining a businesspermitting further operation only under restrictive conditionswhich is an intermittent nuisance two nights a week, six months a year.
In 1950, Mr. Chapuis purchased a home which is adjacent to the property in question. In 1963 or 1964, the dragstrip was open for approximately two months. In 1974, Chapuis had a conversation with Daniels and Todd regarding either a land sale or a lease of a portion of the Chapuis property, which offer was refused. At this time, Chapuis advised Daniels and Todd not to spend any money on developing the dragstrip and warned them that legal action would be taken to prevent their use of the property for auto racing. Chapuis then retained a lawyer who notified Dragstrip to contact him in an effort to reach a mutually satisfactory arrangement concerning the operation of the dragstrip. The parties met several times but failed to reach an agreement.
Subsequently, Dragstrip expended approximately $23,000 on the track and began operating in March, 1975. Dragstrip generally operates on Wednesdays and Fridays, opening about 6:30 p. m. with races conducted between 8:30 and 11:00 p. m. The racing season runs from March through August.
Dragstrip has a county business license, is not located within any municipality, and is not subject to any zoning or other governmental regulations with respect to its operations.
The Chapuises filed suit asking injunctive relief to prohibit further operation by Dragstrip. *502 The complaint charged Dragstrip with operating a nuisancethe principal allegations being the noise and the lights.
Following an ore tenus hearing, the trial Court made the following findings of fact.
"1. Complainants purchased the land on which their home is built in 1950.
"2. Some years later, an oval raceway was constructed on land adjacent to the land of the Complainants. Complainants do not now, nor have they ever complained of the operation of the oval raceway.
"3. Subsequent to the opening of the oval raceway, a drag strip (the operation now in question) was constructed by someone other than Respondents within 500 feet of Complainants' home.
"4. That when the dragstrip began operating, Complainants complained to the original operators but no legal action was taken as the drag strip was closed before action could be brought against the original operators.
"5. In early 1975, Complainants became aware that Respondents proposed to reopen the drag strip.
"6. Complainants met with Respondents to oppose the opening and employed legal counsel for the purpose of opposing the drag operation.
"7. That counsel for Complainants spoke to one or more of the Respondents and also to an attorney representing Respondents to advise them that any investment on the part of Respondents would be at their own risk as Complainants would use all legal means possible to keep the drag strip from operating.
"8. With notice of possible legal actions against them Respondents invested money to renovate the drag strip and began operation.
"9. The Court heard testimony from several witnesses in addition to the Complainants regarding the noise, lights and vibrations caused by the drag strip.
"10. Dr. Louis B. Trucks, an Auburn University professor and an expert in acoustics, used a recording decibel meter and measured the noise level. His testimony was more than convincing to the Court that the noise created by the operation of the drag strip created a considerable nuisance for Complainants.
"11. Respondent Todd operates the drag strip and other than a disability check, it is his only source of income for his family."
After making these findings of fact, the trial Judge decreed the following:
"1. Effective immediately, Respondent can continue to operate the drag strip only under the following conditions:
"a. The hours of operation will be limited to between the hours of 1 p. m. and 6 p. m. on any two days Monday through Saturday. No operations to be allowed on Sunday.
"2. Prior to the next racing season (sometime beginning in the spring of 1977) the following action must be taken by Respondents prior to re-opening the drag strip for racing:
"a. Installation of a heavy duty three cable fence along the north side of the dragway and the entire length of the dragway to prevent any possible damage to Complainants' property.
"b. All loudspeakers will be positioned so they face directly south.
"c. Erect a gate that can be locked to prevent the unauthorized use of the track.
"d. Erect a 7/8" plywood fence 15' high for the entire length of the dragway to help abate the noise caused by the racing. The fence is to be painted a dark color such as green or brown.
"e. If lights are required during the hours of operation, said lights will be put on standards on the north side of the dragway and will shine to the south away from Complainants' home."
Initially, Dragstrip contends that the practical effect of this decree is to completely close down their operation of the dragstrip portion of the raceway. We cannot make this assumption as a matter of law. Whether the restrictions, on which *503 the continued operation is conditioned, effectively enjoined the further use of the dragstrip is a factual determination which this Court is not authorized to make on appellate review.
Conversely, appellees argue that, because of the trial Court's power to enjoin, it is immaterial (i. e., without error) whether the decree completely closed down the operation. Essentially, as we shall later see, the legal premise on which this contention is grounded is correct; but the conclusion is nonetheless inaccurate. The Court's decree, by its explicit terms, did not attempt to totally enjoin Dragstrip's operation; rather, it applied the "comparative injury doctrine." Immediately following "Findings of Fact" and immediately preceding the formal order, the Final Decree recites:
"The Court is aware of the `comparative injury doctrine' as set forth in Brown v. Allied Steel Products Corp., 273 Ala. 184, 136 So.2d 923 (1962), and also in cases of this nature the right of the Court to regulate a business rather than strict injunctive relief. Drennon [Drennen] v. Mason, 222 Ala. 652, 133 So. 689."
We will pursue our discussion of this later in the opinion.
It is established Alabama law that, in determining whether an injunction should issue, wide discretion is accorded the trial judge hearing the application and making the decision. Valley Heating, Cooling & Electric Co. v. Alabama Gas Corp., 286 Ala. 79, 237 So.2d 470 (1970). This discretion includes the power to close a business if the facts indicate that this drastic measure is the only remedy available to abate the nuisance. Hundley v. Harrison, 123 Ala. 292, 26 So. 294 (1898).
In addition to these well-established principles, Alabama also recognizes the "comparative injury doctrine." Although counsel have cited no Alabama case, and we have found none, that directly applied this doctrine, the case cited in the above quoted portion of the trial Court's decree of Brown v. Allied Steel Products Corp., supra, contains, by way of dictum, the following language:
"[O]ur courts follow the `comparative injury doctrine' in injunction cases. . ."
Quoting from earlier Alabama cases, the Court continued:
". . . `In determining this question, the court should weigh the injury that may accrue to the one or the other party, and also to the public, by granting or refusing the injunction.'"
The "comparative injury doctrine" has been generally recognized in American jurisprudence and is but a species of the balancing of the equities principle. Thus, we adopt this doctrine for application in appropriate cases as it is set forth in 42 Am.Jur.2d, Injunctions, § 56, pp. 798, 799. (See also Restatement, Torts, § 941):
"Injunctions are never granted when they are against good conscience, or productive of hardship, oppression, injustice, or public or private mischief, and it may be said to be the duty of the court whose jurisdiction is invoked to secure injunctive relief, when considering the application, to consider and weigh the relative convenience and inconvenience and the comparative injuries to the parties and to the public which would result from the granting or refusal of the injunction sought."
Because the trial Court obviously applied this doctrine, our scope of review is considerably narrowed: Does the trial Court's decree constitute an abuse of judicial discretion? Or, stated more specifically, within the factual context of the record before us: Are the restrictions on which the continued operation of the dragstrip is conditioned supported by competent evidence?
In addressing ourselves to the issue as alternatively posed, we observe initially that this is a proper case for the application of the "comparative injury doctrine." This is not to say that, under the discretionary powers of the trial court over equitable matters, the court was unauthorized to totally enjoin the dragstrip operation. See Hundley v. Harrison, supra. But this case is not so postured to present this issue for *504 review. We hold simply that the trial Court's application of the "comparative injury doctrine" was authorized under the facts and circumstances presented by the record before us.
It is not the application of the doctrine per se, but the details of the specific restrictions with which we find difficulty; and it is our inability to solve this problem area that requires a remandment of this cause for further testimony and a final decree consistent with such further testimony and in conformity with the instructions contained in this opinion.
Illustrative of the several restrictions imposed upon the continued operation of the dragstrip for which there is no supporting testimony is the requirement that Dragstrip erect a 15' high fence of 7/8" plyboard as a means of reducing the noise. The requirement that the fence be painted a specific color (green or brown), as opposed to being left in its natural state, finds no support in the testimony. Likewise, the requirement for a three cable fence along the boundary line between the properties of the respective parties is vague and indefinite, with no evidentiary basis for the purpose to be served by such fence or the likelihood that such fence will serve to cure any existing problem.
By this remand we are not to be understood as taking issue in fact with the specifics of the restrictions as set out and detailed in the trial Court's Final Decree. The traditional rules of appellate review do not authorize this Court to exercise the prerogative of fact finding. Similarly, neither can the trial Court fashion restrictive conditions for the continued operation of a business out of whole cloth. It may well be that each of these restrictions, both in general terms and in specific details, are feasible and necessary, in keeping with the "comparative injury doctrine," to accomplish the equitable abatement of this alleged nuisance. But these restrictions, generally and specifically, to be sustainable, must be founded on competent supportive evidence adduced by the parties before the trial Court.
Subsequent to the issuance of the trial Court's decree in this case, Dragstrip timely filed a motion for a new trial, raising the insufficiency of the evidence to support the restrictive conditions of its right to continue the racing operation. This issue was properly preserved and presented on appeal. For the error of the trial Court in failing to grant the motion and take further testimony respecting the specifics of the restrictive conditions for future dragstrip operations, this case is reversed and remanded.
REVERSED AND REMANDED WITH INSTRUCTIONS.
TORBERT, C. J., and EMBRY, JJ., concur.
BLOODWORTH and ALMON, JJ., concur in the result.
BLOODWORTH, Justice (concurring in the result).
I agree that there is no specific testimony to support the trial judge's requirement that the drag strip "[e]rect a 15' high fence of 7/8" plywood as a means of reducing the noise" and that the fence be painted, but there is testimony to support the erection of some kind of a fence as a barrier.
I agree that there is no specific supporting testimony as to the requirement of a "three cable fence," although there is testimony to support the requirement of a "reinforced" or "chainlink" or "cable" fence as a safety feature alongside the north side of the track "to keep anybody from running off the side of the track" onto the Chapuis' property.
It is thus that I concur in the result to reverse and remand this cause to the trial judge with instructions to hold a hearing for the purposes of addressing these two matters and to determine specifically whether they are necessary to accomplish the purposes for which they were ordered by the trial judge and, further, whether any other or different measures might accomplish these same purposes.
ALMON, J., concurs.