Jack E. **SHERROD**, et ux.,
**Plaintiffs-Appellants,**

v.

B. E. **DUTTON**, et ux.,
**Defendants-Appellees.**

Court of Appeals of Tennessee,
Eastern Section.

March 10, 1982.

Permission to Appeal Denied by
Supreme Court June 21, 1982.

R. Franklin Norton and Lindsay Y. McDonough, McCampbell & Young, Knoxville, for plaintiffs-appellants.

Gerald Largen, Kingston, for defendants-appellees.

OPINION

FRANKS, Judge.

In this action to abate as a nuisance the operation of a go-cart racetrack by the de-

fendant, the trial judge found no nuisance and dismissed the suit. Plaintiffs-home-owners have appealed.

Plaintiffs own a small farm improved by a dwellinghouse and barn in the Oral Community with frontage on U.S. Highway 70 near Kingston, Tennessee. Defendants own an adjoining tract of land where, in 1980, the defendant constructed a dirt race-track for commercial operation, which is located approximately 150 yards from the plaintiffs' dwelling. An access road to the track from Highway 70 lies along the parties' property line and is unpaved. The access road at its junction with the highway is approximately 30 yards from plaintiffs' dwelling.

Prior to the development of the race-track, within one mile radius of the plaintiffs' home, there were residences and small farms, two small country stores and a church. Plaintiffs testified the operation of the track on Friday nights until 10:30 or 11:00 p. m., and occasionally on Saturday nights, creates noise, dust, odors, light and traffic which prohibits normal conversation in social gatherings in their backyard and awakens their young son from sleep. They testified when the track is in operation they are forced to retreat into their home and close all doors and windows to escape the constant loud noise and to prevent red dust from entering their house. The defendants testified that the go-cart made only slightly more noise than a lawnmower and is powered with 3 to 5 h.p., unmuffled engines, the tract is watered prior to races and they control dust on the access road by the use of "burned" motor oil.

Numerous residents of the community testified; some stated the operation of the track substantially interfered with their normal use and enjoyment of their properties while others testified the operation of the track did not bother them.

Plaintiffs employed Dr. David Lipscomb, Director of the University of Tennessee Noise Research Department, to conduct tests on the noise emanating from the track during operation. Dr. Lipscomb was of the opinion, based on his tests, that the noise levels during the operation of the track would substantially interfere with sleep and conversing on plaintiffs' premises. He also testified plaintiffs' property received extra-ordinary noise interference from the track due to the terrain. He explained, due to the circular shape of the track, noise was amplified as noise would be through a loud-speaker, *i.e.*, the noise was cast outward and upward.[1] He opined that since the plaintiffs' property is situated on ground higher than the racetrack, the racetrack's noise is impacted on their property. He stated the type of noise involved gives added offense to the human sensibilities and characterized the sounds as unnatural, being inconsistently high and then low, quiet then noisy. This fact, he concluded, coupled with the noise being of high pitch, sensitive to the ear, gave the noise a quality more bother-some than would normally be expected from man-made sounds.

The chancellor, after hearing the testimony, stated in pertinent part:

Gentlemen, I think the testimony of these neighbors certainly is very significant, along with the testimony of Dr. Lipscomb, to try to weigh the community standards of what is acceptable noise, odor, and dust level. *Certainly there is some noise, some dust, some irritants as the result of this particular use of this property.* But, after listening to all the testimony in this case and trying to weigh whether or not the use of Mr. Dutton's property is an unreasonable use in relation to the community standards, I think that the go-cart track is not such a use as would constitute *a legal nuisance.*

*I would probably agree with Mr. Baumgart* [a witness] *... he said that this type activity in his opinion was a nuisance. If I probably lived in Mr. Sherrod's house I would think it was a nuisance.* But of course, that use of the

---

1. The racetrack also employs a loudspeaker system to announce the participants of each race and how they finished. On one occasion a University of Tennessee football game was broadcast over the public address system between races.

language is entirely different from the *legal conclusion of what a nuisance is.* . . . I don't think that this use has risen to the standards required in order to restrict Mr. Dutton from the free use of his property. [Emphasis supplied.]

Apparently, the chancellor evaluated the evidence as to whether the racetrack constituted a public nuisance or a nuisance *per se,* but pretermitted the issue of whether the operation of the track constituted a nuisance in fact. The chancellor's community standards approach deviates from the proper inquiry developed in prior Tennessee cases for determining whether a nuisance in fact exists. By over-emphasizing this factor the chancellor did not address the ultimate issue as to whether the racetrack unreasonably interferes with the plaintiffs' use of their property, a factual issue. The impact on the surrounding community is only one factor to be considered in making this determination. The factors[2] to be considered are set forth in *Caldwell v. Knox Concrete Products,* 54 Tenn.App. 393, 391 S.W.2d 5 (1964):

A nuisance has been defined as anything which annoys or disturbs the free use of one's property, or which renders its ordinary use or physical occupation uncomfortable. *Adams v. Hamilton Carhartt Overall Co.,* 293 Ky. 443, 169 S.W.(2d) 294. In *City of Nashville v. Nevin,* 12 Tenn.App. 336, it was said that a nuisance extends to everything that endangers life or health, gives offense to the senses, violates the laws of decency, or obstructs the reasonable and comfortable use of property. *See also Williams v. Cross,* 16 Tenn.App. 454, 459, 65 S.W.(2d) 198.

What is a reasonable use of one's property and whether a particular use is an unreasonable invasion of another's use and enjoyment of his property cannot be determined by exact rules, but must necessarily depend upon the circumstances of each case, such as locality and the charac-

ter of the surroundings, the nature, utility and social value of the use, the extent and nature of the harm involved, the nature, utility and social value of the use or enjoyment invaded, and the like. *See Clinic & Hospital v. McConnell,* 241 Mo. App. 223, 236 S.W.(2d) 384, 23 A.L.R.(2d) 1278; Restatement, Torts, Secs. 822, 831, pp. 214, 265. 54 Tenn.App., at 402, 391 S.W.2d 5.

*Caldwell* expresses that a lawful and useful business will not be interfered with on account of trifling or imaginary annoyances but makes clear that anyone, without regard to his station, may not be driven from his home or compelled to live in positive discomfort although caused by a lawful and useful business carried on in his vicinity. 54 Tenn.App. at 403, 391 S.W.2d 5. *Accord: Signal Mountain Portland Cement Company v. Brown,* 141 F.2d 471 (6th Cir. 1944); *Bank & Trust Co. v. Hotel Co.,* 124 Tenn. 649, 139 S.W. 715 (1911); *Terminal Co. v. Lellyett,* 114 Tenn. 368, 85 S.W. 881 (1904); *Swain v. Tennessee Copper Co.,* 111 Tenn. 430, 78 S.W. 93 (1903); *Terminal Co. v. Jacobs,* 109 Tenn. 727, 72 S.W. 954 (1902); *Ducktown Sulphur, Copper & Iron Co., Ltd. v. Barnes,* 60 S.W. 593 (Tenn.1900); *Wilson v. Farmers Chemical Assn.,* 60 Tenn.App. 102, 444 S.W.2d 185 (1969); *Hagaman v. Slaughter,* 49 Tenn.App. 338, 354 S.W.2d 818 (1961); *Crabtree v. City Auto Salvage Co.,* 47 Tenn.App. 616, 340 S.W.2d 940 (1960); *City of Murfreesboro v. Haynes,* 18 Tenn.App. 653, 82 S.W.2d 236 (1935).

The evidence establishes the plaintiffs' experience discomforts each time the track is in operation; there is no direct evidence refuting the testimony of plaintiffs and their witnesses that noise and dust from the racetrack and access road physically invade their premises and cause positive discomforts. Dr. Lipscomb's tests established the noise level outside plaintiffs' dwelling ranged from 48 decibels to 85 decibels and inside the readings ranged from 36 decibels to 65 decibels; the lower decibel readings

**2.** The factors set out in *Caldwell* are similarly expressed in the *Restatement (Second) of* Torts, §§ 827 and 828.

were higher pitched noises, which still cause discomfort to the normal ear. At all levels the readings were above the levels for sleeping (indoor readings) and conversing (outdoor readings). The evidence supports Dr. Lipscomb's conclusions that the race-track interferes with the plaintiffs' ability to sleep and converse.[3]

Go-cart racing is a use of property unique to the locality in question and intrusive as to the plaintiffs' property. Its operation's impact is accented since, during the evening hours, the primary noises in the community created by farm animals, farming machinery and traffic on Highway 70 diminish; however, the racetrack as a recreational facility serves a useful societal function [4], but the facility substantially interferes with plaintiffs' quiet enjoyment of their home and the law protects the rights of home-owners from unreasonable disturbances. Comment f. to § 828 of *Restatement (Second) of Torts* notes the deference accorded the traditional use of property for residential purposes.[5] This stance is expressed in *Caldwell* and other Tennessee cases. *See e.g., Pate v. City of Martin*, 614 S.W.2d 46 (Tenn.1981); *Wright et al. v. State*, 130 Tenn. 279, 170 S.W. 57 (1914); *Weakley v. Page*, 102 Tenn. 178, 53 S.W. 551 (1899); *Hendrix v. City of Maryville*, 58 Tenn.App. 457, 431 S.W.2d 292 (1968); *Wilson v. Farmers Chemical Assn., supra; City of Columbia v. Lentz*, 39 Tenn.App. 350, 282 S.W.2d 787 (1955); *City of Murfreesboro, supra.*

◼ The evidence establishes two inconsistent yet legitimate land uses and the protection of one necessarily results in an infringement on the other.[6] Although busi-

---

**3.** To provide some practical context to the decibel readings, the following data from noise nuisance cases in other jurisdictions is helpful:

In *Bostick v. Smoot Sand and Gravel Corporation*, 154 F.Supp. 744 (D.Md.1957), the following sounds were described as creating the following decibel levels:

| Decibel Level | Noise |
|---|---|
| 15 | quiet whisper |
| 30-35 | soft music |
| 50-60 | conversational speech |
| 67-68 | home radio |
| 70 | orchestra |
| 75 | typewriters in a closed room |
| 100-110 | loud thunder |

In *Lee v. Rolla Speedway, Inc.*, 539 S.W.2d 627 (Mo.App.1976), the following decibel levels were described as causing the following community reactions:

| Decibel Level | Community Reaction |
|---|---|
| Less than 40 | no reaction |
| 40–50 | sporadic complaints |
| 45–55 | widespread complaints |
| 50–60 | threats of community action |
| Greater than 65 | vigorous community action |

**4.** The evidence establishes that as many as 200 cars transport spectators and participants to the races on a given night and as many as 50 go-carts participate in the races, with as many as 15 taking part in a given race.

**5.** f. *Measure of social value.* How much social value a particular purpose has depends upon the extent to which its achievement generally advances or protects the public good. There is no universal, fixed scale by which courts can measure the amount of social value that a particular purpose or objective has. They will consider the community standards of relative social value prevailing at the time and place and also what has traditionally been regarded as the relative social value of various types of human activity. Certain types of activity have always been looked on as having considerable social importance and value. The use of one's own land for ordinary residential and agricultural purposes, for example, has traditionally been regarded as having high social value, as has the use of public highways for ordinary purposes of travel. Other types of activity, such as the use of one's land or the public highway for extraordinary or unusual purposes, are not always so highly regarded. On the whole, the activities that are customary and usual in the community have relatively greater social value than those that are not, and those that produce a direct public benefit have more than those carried on primarily for the benefit of the individual. Other factors being favorable, the greater the social value of one's primary purpose the greater the utility of his conduct. *Restatement (Second) of Torts*, § 828, at 131–2.

**6.** "The problems of the reciprocal use and enjoyment of property by adjacent landowners have become increasingly pronounced in our time of intense urbanization. Salient has been the problem of noise nuisances which frequently result when adjacent property is devoted to the inconsistent uses of industry and residence ownership. This conflict is often a serious one. The enjoyment by the residence owner of his property may be considerably impaired; the abatement of the noise may be at the price of

ness enterprises are not allowed to enter a community and unreasonably interfere with the present property owners' enjoyment of their property, the courts attempt to accommodate both residential and business uses. The use of an injunction to totally abate a lawful enterprise is sparingly used. As stated in *Hagaman v. Slaughter, supra:*

"Ordinarily, a mandatory injunction is limited to the acts complained of, leaving the right to carry on the business in a proper and lawful manner, and the operation of a lawful business will not be enjoined without a clear showing that it is impossible or impracticable to eliminate its offensive features. *Wright v. State,* 130 Tenn. 279, 170 S.W. 57, 58, wherein the rule is stated:

"'The conduct of the business itself should not be prohibited, unless it clearly appears that the plant cannot be operated without creating a nuisance.'"

"The operation of a legitimate business or industrial plant which constitutes a private nuisance may be enjoined where it clearly appears that there is no other complete remedy for the injury done. But this should never be done if it is possible to avoid it while still giving the plaintiff the relief to which he is entitled. In such cases, the courts will go no further than is absolutely necessary to protect the rights of the complaining parties, and, if the business or plant can be so conducted as not to constitute a nuisance, the injunction should be limited to prohibiting the acts complained of which constitute the nuisance, leaving the defendant free to operate it in a lawful manner." 39 Am.Jur. 444, *Nuisance,* Section 172. 49 Tenn.App., at 346–7, 354 S.W.2d 818.

■ *Hagaman* and *Crabtree, supra,* involved junkyards and the court enjoined the most objectionable aspects of their operations while allowing the enterprises to otherwise function. Accordingly, total abate-

ment of the operation of the racing facility would be improper; however, plaintiffs are entitled to relief from the dust and the noise intrusions in the night-time. In this connection, *see Daniels v. Chapuis,* 344 So.2d 500 (Ala.1977), *appeal after remand* 352 So.2d 1114 (Ala.1977); *DeNucci v. Pezza,* 114 R.I. 1123, 329 A.2d 807 (1974); *Jones v. Queen City Speedways, Inc.,* 276 N.C. 231, 172 S.E.2d 42 (1970); *Smith v. Western Wayne County Conservation Association,* 380 Mich. 526, 158 N.W.2d 463 (1968). The rationale of the foregoing cases is characterized in the following quotation from *Gilbough v. West Side Amusement Co.,* 64 N.J.Eq. 27, 53 A. 289 (1902):

That mere noise may be so great . . . as to amount to an actionable nuisance . . . is thoroughly established. The reason why a certain amount of noise is or may be a nuisance is that it is not only disagreeable, but it also wears upon the nervous system and produces that feeling which we call "tired". . . . Another reason is that mankind needs rest and sleep, and noise tends to prevent both. . . .

Mankind needs sleep for a succession of several hours once in every 24 hours, and nature has provided a time for that purpose, to wit, the nighttime, and by common consent of civilized man the night is devoted to rest and sleep, and noises which would not be adjudged nuisances . . . if made in the daytime, will be declared to be nuisances if made at night and during the hours which are usually devoted by the inhabitants of that neighborhood to sleep. 53 A., at 289.

■ The cause will be remanded to the trial court to enter a mandatory injunction barring the defendant from further operating the racetrack until he obtains a business permit to commercially operate the track and a permit for ingress and egress onto Highway 70. The evidence establishes at the time of trial these permits required by Tennessee law had not been obtained. *See*

loss of productivity, considerable expense or of not conducting the business at all. The resulting situation is one which requires a most careful balancing of equities." [Footnote omitted.]

7 Van.L.Rev., *Noise Nuisances: Commercial Enterprises v. Owners of Residential Property,* at 695.

State v. Feezell, 218 Tenn. 17, 400 S.W.2d 716 (1966). Upon compliance with these requirements, defendant will be required to pave the access road to the racetrack and water the track as frequently as necessary to prevent unreasonable dust during races. The defendant is further enjoined from conducting races, or operating the public address system, after sunset, or permitting others to use the track in the night-time.

This cause is remanded to the trial court for issuance of a permanent injunction in accordance with this opinion.

Costs of the appeal are assessed against the defendant.

SANDERS and GODDARD, JJ., concur.